**Samuel W. FORDYCE et al.**

v.

**The UNITED STATES.**

No. 558–79L.

United States Court of Claims.

June 3, 1981.

Edward Greensfelder, Jr., Washington, D. C., attorney of record, for plaintiffs.

Gerald P. Greiman and Greensfelder & Greiman, P. C., Washington, D. C., of counsel.

Charlotte R. Bell, Washington, D. C., with whom was Acting Asst. Atty. Gen. Anthony C. Liotta, Washington, D. C., for defendant.

Lars Hanslin, Dept. of the Interior, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This is an action by the operators of a terminated concession in a national park for compensation for the value of the building and improvements in which they conducted operations. The question is whether under the contract granting the concession and the Concession Policies Act of 1965, 16 U.S.C. § 20e, the plaintiffs may recover the "sound value" (as defined in the Concession Policies Act, see p. 4, *infra*) of the building and improvements rather than, as the defendant urges, the book value of the property. Both sides have moved for summary judgment, and we heard oral argument. We hold that the plaintiffs may recover "sound value," and we remand the case to the Trial Division to determine what that value is.

## I.

The parties have stipulated the following facts. The concession improvements involved are the Fordyce Bathhouse, and its fixtures and equipment, located in the Hot Springs National Park, Hot Springs, Arkansas. The park's unique system of thermal waters is its chief point of interest. In the late 19th and early 20th centuries there was constructed at Hot Springs a row of health spa buildings, which today are considered architecturally and historically important. The Fordyce Bathhouse, built in 1914 by an ancestor of the plaintiffs, is one of the most prominent of these spas. It is a two-story building containing 27,300 square feet of space, exclusive of its basement; the Park Service has described it as a "monumental structure" with "unique interior architectural features ...." U. S. National Park Service, General Management Plan for Hot Springs Bathhouse Row and Vicinity 21 (1978).

The Fordyce Bathhouse was built on land which then was, as it is today, owned by the United States and administered by the Department of the Interior. Since 1921, the land has been part of the national park system. *See* Act of Mar. 4, 1921, ch. 161, § 1, 41 Stat. 1407.

Beginning in 1955, the plaintiffs operated the bathhouse under a contract with the Secretary of the Interior. The contract recognized that the plaintiffs held a "possessory interest" in the concession improvements "consisting of all incidents of ownership, except legal title which shall be vested in the United States," and that this interest would not be extinguished by the termination of the contract without payment of "just compensation." The contract stated, however, that the possessory interest did not "include or imply any authority, privilege or right to operate or engage in any business or other activity" and would be enjoyed "wholly subject to" the contract and "the laws and regulations relating to the park."

In 1962, with the Park Service's permission, the plaintiffs discontinued operations at the bathhouse, but continued to pay franchise fees and other charges and file annual financial reports with the Park Service, as the contract required. The bathhouse remained unused and vacant through December 31, 1974, when the contract expired. The Park Service did not renew the contract, but instead decided to acquire the plaintiffs' possessory interest and to convert the bathhouse into the park's main visitor center.

After some unsuccessful attempts to negotiate compensation for the improvements, the Park Service took possession and tendered the plaintiffs a check for $472.63, representing the book value of the possessory interest based upon the financial report the plaintiffs filed for the final year of the contract. The plaintiffs rejected the check and filed this suit.

## II.

A. The 1955 contract pursuant to which the plaintiffs operated the Fordyce Bathhouse contained two provisions governing the compensation the plaintiffs were to receive upon the termination of their posses-

sory interest in the bathhouse. Section 11(a) provided that "[i]f for any reason, the Concessioner shall cease to be authorized to conduct the operations authorized hereunder, or any of them, and thereafter such operations are to be conducted by a successor, whether a private person or an agent of the government," the concessioner will transfer to the successor its possessory interest in the improvements, and the Secretary will require the successor to pay the concessioner the "fair value" of that possessory interest. "Fair value" is defined as "the sound value of the improvements to which it relates at the time of transfer of such possessory interest, without regard to the term of the contract."

Section 11(b) covered situations where, "during the term of this contract or upon its termination for any reason," the Secretary decided that it was "desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the concessioner's improvements. . . ." In such situations, the contract directed that "the Secretary will, before making such a determination effective, take such action as may be necessary to assure the Concessioner of compensation (1) for its possessory interest in such improvements in an amount not less than their book value. . . ."

The "operations authorized" under the contract were the "mainten[ance] and operat[ion]" of the "bathing accommodations, facilities, and services." Since the Secretary did not intend to resume those operations, but instead planned to use the facilities as a visitors' center, section 11(b) rather than section 11(a) was the contractual provision that governed the amount of compensation the plaintiffs were to receive upon the termination of their "possessory interest" in the facility.

B. 1. Ten years after the contract was executed, Congress enacted the Concession Policies Act of 1965. Section 6 of that Act, 16 U.S.C. § 20e, provides that concessioners who, pursuant to a contract, theretofore had acquired (or thereafter would acquire) any structure, fixture, or improvement upon government-owned land in a national park "shall have a possessory interest therein," which "shall not be extinguished by the expiration or other termination of the contract and may not be taken for public use without just compensation." It states:

Unless otherwise provided by agreement of the parties, just compensation shall be an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value.

The Act covers contracts in existence at the time of its enactment. It applies to a concessioner "who has heretofore acquired or constructed . . ., pursuant to a contract and with the approval of the Secretary, any structure, fixture, or improvement . . . ." The government does not deny that the Act applies in this case. Under section 6 of the Act, the plaintiffs would be entitled to the "sound value" of the bathhouse, to be determined as that section requires, but not to exceed fair market value.

2. The government contends, however, that the 1955 "agreement of the parties" has "otherwise provided" within the meaning of the "unless" exception. The government therefore concludes that the basis for determining the plaintiffs' compensation is not the "sound value" that section 6 mandates, but the "book value" that, according to the government, is the measure of just compensation under section 11(b) of the contract.

A fatal flaw in the government's argument is its interpretation of section 11(b) of the contract as entitling the plaintiffs to receive only the book value of the bathhouse. The contract provides that they are entitled to "not less than" book value. The words "not less than" indicate a floor under and not a ceiling upon the compensation to be paid. *Cf. Bishop v. United States*, 164 Ct.Cl. 717, 726 (1964) (the same language, "by plain implication, authorized the Secre-

tary of the Interior to pay the plaintiff an amount greater than the book value of the improvements if the Secretary should deem a larger sum justifiable"); *United States v. Binghamton Construction Co.*, 347 U.S. 171, 177–78, 74 S.Ct. 438, 441–42, 98 L.Ed. 594 (1954) (requirement in Davis-Bacon Act that wages of workers on government construction projects shall be "not less than" minimum wages as determined by the Secretary of Labor "fix[es] a floor under wages" and "presupposes the possibility that the contractor may have to pay higher wages" than "the specified minima").

The language of this contract sharply contrasts with the standard contract the Park Service began to use shortly before the Concession Policies Act. *See Park Concession Policy, Hearings on H.R.5872, H.R. 5886, H.R.5873, H.R.5887, and H.R.5796 Before the Subcomm. on National Parks of the House Comm. on Interior and Insular Affairs*, 88th Cong., 2d Sess. 79 (1964). That contract requires the Secretary to compensate concessioners for their concession improvements "in the amount of their book value." Under this provision a concessioner's "total and exclusive remedy is the book value of its possessory interest . . . ." *Eldorado Canyon Resort v. United States*, 209 Ct.Cl. 759, 761 (1976); *see Schoeffel v. United States*, 193 Ct.Cl. 923 (1971). If the parties to the present contract had intended to limit the concessioner to the book value of the bathhouse, presumably they would have said so, as was done in many other contracts, and would not have used the broader phrase "an amount not less than . . . book value."

Our decision in *Bishop v. United States, supra*, upon which the government relies, does not require a contrary conclusion. In *Bishop*, which involved the identical language, we held that the concessioner was not entitled to more than the book value of his facilities. The plaintiff's "primary contention" there was that the government's failure to renew the concession constituted a taking of the concession buildings, for which he was entitled to just compensation under the fifth amendment. We rejected that contention, holding that there had not

been a taking. 164 Ct.Cl. at 722–23. Alternatively, the plaintiff argued that the book value of the buildings was either $149,-834.54 or $118,619.11. We held, however, that, properly determined, the book value was $10,263.69, which we awarded the plaintiff. *Id.* at 724–27.

Although noting that the contract authorized the Secretary to pay more than book value, we concluded that "there is nothing in the record to warrant the conclusion that the plaintiff would be entitled to an amount greater than the book value." *Id.* at 726. *Bishop* does not stand for the proposition that the contractual provision that the plaintiffs are to receive "an amount not less than . . . book value" constitutes an agreement between the parties that the plaintiffs are entitled to no more than book value. *Bishop* held only that, on the record before us in that case, the plaintiff had not shown that it was entitled to more than book value.

In sum, since the parties in the contract here have not "otherwise provided," the sound value standard in section 6 of the Concession Policies Act governs the determination of the compensation the plaintiffs are to receive on termination of their possessory interest in the bathhouse.

3. The legislative history of the Act confirms this conclusion. Both the Senate and House Committee Reports, after quoting the "sound value" standard of compensation in section 6, stated that "the parties may, if they choose, adopt another standard by explicit provision in their contract." *See* S.Rep.No.89–765, 89th Cong., 1st Sess. 3–4 (1965), *reprinted in* [1965] U.S.Code, Cong. & Ad.News 3489, 3491; H.R.Rep.No.89–591, 89th Cong., 1st Sess. 3–4 (1965). The other "standard" to which the committees referred was the standard for determining the "compensation [that] must be paid for the possessory interest if it is taken by the Government for its own use." *Id.*

Section 11(b) of the present contract, however, does not provide "another standard" for determining compensation. It merely specifies that the amount the plain-

tiffs are to receive must be at least book value. To whatever extent the parties have "otherwise provided" in the contract, they have agreed only that if the determination of "sound value" produces an amount less than book value, the plaintiffs nonetheless will receive book value. By their agreement in this case the parties have not substituted book value for "sound value" as the standard for determining compensation.

The government points out that the congressional reports state that the principal purpose of the Concession Policies Act was "to put into statutory form policies which, with certain exceptions, have heretofore been followed by the National Park Service in administering concessions within units of the national park system and in writing concession contracts for concessionaire services there." S.Rep.No.89–765, 89th Cong., 1st Sess. 1 (1965), *reprinted in* [1965] U.S. Code, Cong. & Ad.News 3489, 3489; H.R. Rep.No.89–591, 89th Cong., 1st Sess. 1 (1965). This congressional intent not to override contracts then in effect, the government asserts, demonstrates that Congress intended parties to contracts like the plaintiffs' to receive only the book value of their concession improvements.

The legislative history, however, shows that the type of Park Service contract to which Congress referred was that providing for the concessioner to receive compensation "in the amount of book value." *See* S.Rep.No.89–765, 89th Cong., 1st Sess. 4 (1965) *reprinted in* [1965] U.S.Code, Cong. & Ad.News 3489, 3492; H.R.Rep.No.89–591, 89th Cong., 1st Sess. 4 (1965). There is no indication that Congress was aware of contracts providing for payment of "not less than book value." *See Hearings, supra.* Since the Act was intended to protect concessioners' investments (*Senate and House reports, supra, passim*), Congress did not intend to treat contracts providing for payment of "not less than book value" as if they read "in the amount of book value."

The government also points to testimony at the hearings on the bills describing the value to the Park Service and the fairness to the concessioner of using the book value provision when concession operations are discontinued. The Park Service representative stated that it would give concessioners a windfall to compensate them for fair market value or replacement cost when their loss results from a change in Park Service policy that requires abandonment of the concession. *See Hearings, supra,* 90, 130.

It does not follow, however, as the government infers, that Congress therefore intended to limit to book value the compensation to a concessioner whose contract entitled it to payment of "not less than book value." As the context of these statements shows, the Park Service representative was discussing the more recent standard concession contract that set payment "in the amount of book value." Moreover, the statute as enacted did not follow the recommendation of the Interior Department. The Concession Policies Act established sound value as the general standard, and did not limit that standard to those cases in which a new concessioner would continue the concession operation with the existing facilities.

C. In holding that the plaintiffs are entitled to the "sound value" (as defined in the Concession Policies Act) of the Fordyce Bathhouse, we intimate no opinion regarding the amount of that value. In its negotiations with the plaintiffs, the Park Service contended that the fair market value (which, under the Act, the "sound value" cannot exceed) of the plaintiffs' possessory interest in the improvements is $1. If, upon the remand that we are ordering, the trial judge should determine that the "sound value" is less than the book value, which the parties agree is $472.63, then the plaintiffs are entitled to the latter amount. Also, we do not decide, or intimate any view on, the proper standard for compensation of a concessioner, in circumstances comparable to the plaintiffs', whose contract contains a clause setting compensation for improvements "in the amount of their book value."

## CONCLUSION

The defendant's motion for summary judgment is denied, and the plaintiffs'

cross-motion for partial summary judgment is granted. The case is remanded to the Trial Division to determine under Rule 131(c) the amount of the plaintiffs' recovery in accordance with this opinion.